UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARA DEPINA,<br><br>    Plaintiff,<br><br>v.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC.,<br><br>    Defendant. | Case No. 23-cv-00156-TLT<br><br>**ORDER DENYING CLASS CERTIFICATION**<br><br>Re: Dkt. No. 34 |

Plaintiff Clara Depina, on behalf of herself and all others similarly situated, brings this class action suit on behalf of two classes and two subclasses against Defendant FedEx. ECF 34. She asserts four causes of action, including violations of FedEx's obligations (1) to keep track of all hours worked under the Industrial Welfare Commission ("IWC") Wage Order No. 9 § 4; (2) to pay wages for security checks under the IWC Wage Order No. 9 § 7(a); (3) to pay employees meal period and rest break premiums and minimum wage under the Cal. Labor Code § 512; and (4) to provide accurate wage statements and pay final wages under the Cal. Labor Code § 226(a). *Id*.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Depina seeks to certify the following classes of an estimate 69,000 package handlers:

> **Security check class:** All persons employed by FedEx as package handlers in hourly or non-exempt positions in California who underwent security screening during the relevant time period.
>
> > **Security Check Meal Period Sub-Class:** All Security Check Class members who worked a shift in excess of five hours.
> >
> > **Security Check Rest Break Sub-Class:** All Security Check Class members who worked a shift of at least three and one-half hours.
>
> **Recordkeeping Meal Period Class**: All persons employed by FedEx as package handlers in hourly or non-exempt positions in California

who worked a shift in excess of five hours during the relevant time period whose timekeeping records reflect a late, shortened, or missed meal period.

ECF 34. The "relevant time period" in this case is from February 4, 2022 to the present. ECF 48-1 ¶ 3.

Before the Court is Depina's motion for class certification. ECF 34. After review and consideration of the motion, briefings, attachments and exhibits thereto, the motion for class certified is **DENIED**.

## I. PROCEDURAL HISTORY

On November 18, 2022, plaintiff Clara Depina, on behalf of herself and all other similarly situated, filed a class action in the Superior Court of the State of California, County of Sonoma alleging eight causes of action. ECF 1, Ex. A. FedEx removed the action to this Court, invoking jurisdiction under the Class Action Fairness Act. ECF 1. Depina filed Amended Complaint on January 25, 2023. ECF 4. FedEx filed Answer. ECF 10. Depina then filed this Motion to Certify Class. ECF 34 ("Mot."). FedEx filed Response with two appendices. ECF 43 ("Opp'n"); ECF 44 (Appendix); ECF 45 (Appendix). Depina filed Reply and Errata. ECF 48 (Reply); ECF 49 (Errata). FedEx filed objections to Depina's Reply. ECF 50. The Court held a hearing on the Motion for Class Certification on October 15, 2022, at 2:00 p.m. ECF 74.

## II. BACKGROUND FACTS

Plaintiff Clara Depina worked for Defendant FedEx Ground Package System, Inc. ("FedEx"), a corporation that offers package pickup and delivery services throughout the United States. Opp'n 8. Depina was employed as an hourly, non-exempt package handler employee. ECF 4, at 5. Package handlers sort and scan inbound packages as well as load and unload the packages from trucks. Declaration of Clara Depina ("Depina Decl.") ¶ 3. While Depina worked as a package handler from approximately March 2022 through July 2022, she indicated during the motion hearing that the relevant class begins on February 4, 2022 because a prior settlement for *Cuadra v. FedEx Ground Package Sys., Inc.*, involving similar issues, ended on February 3, 2022. ECF 4, at 5.

FedEx requires all individuals entering and exiting its 58 California facilities, including

package handlers, to undergo security screenings. ECF 47, Ex. 11, at 1; ECF 71. The purpose of inbound security is to ensure that only authorized individuals enter the facility, to detect firearms, weapons, and prohibited items, and to "maintain a safe work environment." *Id.* Alternatively, the purpose of outbound security screening is primarily for loss prevention, or to "ensure that individuals are not exiting the facility while in possession of unauthorized customer product or company property, or in possession of prohibited items." *Id.* at 4. Depina alleges that FedEx did not fully compensate the putative class members for the required security screenings and that these security screenings resulted in shortened, interrupted, or late meal periods and rest breaks. Mot. at 1.

### A. Security Screening

As cited by the parties, FedEx's policy states that all individuals entering or exiting FedEx are subject to entry and exit security screening. ECF 47, Ex. 11, at 1 (policy last updated November 18, 2022). This security configuration, however, is at the discretion of the individual facility and may consist of a "walk-through metal detector, a handheld metal detector, an X-ray machine or visual search." *Id.* FedEx reserves the right to refuse entry to those who do not comply with the screening process, although no one is "obligated to submit to a security screening." *Id.* Some stations and hubs also have random outbound screening devices meant to reduce the number of individuals who are screened while exiting the facility. ECF 47, Ex. 11, at 5.

In practice, different facilities have different security practices. As the policy indicates, some facilities have metal detectors while others have turnstiles. *Cf.* ECF 34, Ex. 20, Declaration of Tayvon Thomas-Harris ¶ 10 (testifying that there was an airport-style metal detector and a metal detector wand); ECF 34, Ex. 26, Declaration of Robert Williams ¶ 10 (explaining that there was a metal detector); ECF 45, Ex. 41, Declaration of Kevin Provost ¶ 6 (stating that while there "are no metal detectors or security guards on site at the entrance," he does "need to walk through a turn-style gate and swipe a bag to enter the building'). However, other facilities occasionally lack security screening altogether. *See* ECF 45, Ex. 44, Declaration of Tonya Fistolera ("Fistolera Decl.") ¶ 6 (explaining that "[t]here currently is no security, no one checking bags, no metal

3

detectors or anything like that" although there was the year before); ECF 45, Ex. 97, Declaration of Derick Montes ¶ 6a (explaining that some days there is "no security guard there, so I just walk through" but that even on days the security guard is there but the "metal detector is frequently turned off").

At some facilities, employees alleged they had to wait in lines of up to 40 people and wait between 20 to 30 minutes to get to the front of the line. ECF 34, Ex. 21, Declaration of Ryan Martinez ¶ 9; ECF 34, Ex. 25, Declaration of Kristen Foreman ("Foreman Decl.") ¶ 11. At other facilities, there were only lines of 5 to 10 people that took about 2 minutes to get to the front. ECF 34, Ex. 19, Declaration of Logan Cranston ("Cranston Decl.") ¶ 9. Depina herself alleged that she waited in lines that took 10 to 15 minutes, but also lines that took 2 to 5 minutes. Depina Decl. ¶5. Some declarants testify that their facilities had little to no security. *See* ECF 45, Ex. 40, Declaration of Steven Herrera ¶ 6 ("There is no security check process at my station."); Fistolera Decl. ¶ 6 (explaining that there is "no security, no one checking bags, no metal detectors or anything like that").

In addition, FedEx had two methods by which it paid its employees for security screenings during the putative class period: (1) flat rate amounts and (2) rates based off of the use of security time clocks. ECF 44, Ex. 3, Declaration of Christa Grabowski ("Grabowski Decl.") ¶ 12-13. The amount FedEx pays in flat amounts ranges between 1 and 3 minutes depending on the facility. *Id.* ¶ 14. The flat rate is calculated based on the number of time punches recorded. *Id.* For example, a flat rate of one minute with two punches results in 2 minutes of security pay. *Id.*

For the second payment method, FedEx began to install timeclocks so that employees could clock in before undergoing security on July 3, 2022, about 5 months after the beginning of the putative class period. ECF 47, Ex. 14 (listing the dates the time clocks were installed in California facilities). FedEx installed time clocks at seven of the 58 facilities in 2022 and 36 more facilities in 2023. *Id.* As of January 24, 2024, FedEx introduced a policy that required employees to punch into the security area time clocks "upon both arrival and departure" because "court decisions have suggested that security waiting and screening time may be compensable." ECF 43, Ex. 28. Even after January 2024, however, employees allege that they can choose whether to use

4

the security time clocks. *See* Montes Decl. ¶ 6b ("I have never used the time clocks in the security area."); ECF 45, Ex. 49, Declaration of Jaime Martinez ¶ 8 ("I also make sure that I clock in, so that I get paid for the time I spend going through security"); ECF 45, Ex. 57, Declaration of Mikayla Barajas ("Barajas Decl.") ¶ 6 ("I use the security clocks when exiting if I remember. Sometimes I don't remember and forget to use them.").

When a package handler punches in and out within the same minutes, they are paid the applicable flat pay. Grabowski Decl. ¶ 15. FedEx sets a maximum of 11 minutes for security punch pairs. *Id.* ¶ 16.

### B. Meal Periods

FedEx's written policy provides that an employee must "be relieved of all duties during a meal period." ECF 34, Ex. 7, at 13. Furthermore, package handler employees "must clock out for meal periods." *Id.* Depina submits testimony from declarants who either felt they had to stay in the facility during their rest breaks because the lines were too long for them to leave or had shortened meal breaks when they left the facility due to the shortened meal breaks. ECF 34. Some of them stayed in the facility because the security lines were too long for them to leave. *See* ECF 34, Ex. 23, Declaration of Tristina White ("White Decl.") ¶ 21 (explaining that she remained on the facility for her meal periods because she would not have time to take a full 30-minute meal break due to the security lines); ECF 34, Ex. 24, Declaration of Edgar Sumano ¶ 21 (same); ECF 34, Ex. 33, Declaration of Emily Fuentes ¶ 25 (same).

Others stated that they chose to leave the facility and their meal periods were shortened by the security lines to leave and come back. *See* Cranston Decl. ¶ 26 (alleging that he had between 15 to 20 minutes for his meal period after going through security); ECF 34, Ex. 40, Declaration of Robert Fromson ¶ 23-24 (stating that his meal periods were shortened and interrupted because it would take him 3 to 5 minutes to get through the security check each time); ECF 34, Ex. 31, Declaration of Maria Seymore ¶ 25 (stating that the long security lines left her with just 10 minutes for her meals).

Depina also stated that her meals were shortened due to the long line of people trying to clock in and out. *See* ECF 47, Deposition of Depina ("Depina Depo.") 160: 8-21; 161:24-162:1.

5

She alleges that there were 15 to 20 people waiting at her time clock to clock out and that it took her up to 20 minutes to clock out. *Id.* 160: 15-16.  Her declarants only commented on clocking out for meals, and they state that while there are lines to clock in, they take only a few minutes. *See* Cranston Decl. ¶ 30 ("When I get to the area where I am going to clock in, there is usually a few people already there who are also waiting to clock in.  Because of this, it takes me approximately 2 minutes to clock in."); ECF 34, Ex. 22, Declaration of Sostenes Ortiz Decl. ¶ 31 ("It would take me approximately 1 to 3 minutes to clock in."); White Decl. ¶ 22 ("When I returned from my meal period, because everyone was went [sic] on their meal period at the same time there, there would be a line and it takes approximately 4 minutes to clock in.").

FedEx's declarations allege that employees have an opportunity to take a meal break of least 30 minutes or a rest break when they work for the required period of time.  This is 3.5 hours in a day for a rest break and 5 hours for a meal break.  Ex. 44, Ex. 2e.  Out of the declarants who work long enough shifts to have a meal break, many of them contended that they leave the premises for meal breaks and that the security line does not significantly shorten their breaks. *See* ECF 45, Ex. 43, Declaration of Jamie Evans ¶ 7 (explaining that he does not have to go through security to leave and that he can clock out and leave immediately); ECF 45, Ex. 234, Declaration of Joseph Kosavek ¶ 11 (stating that it takes about a minute to get through security at the start of the meal break and there are only 2 or 3 people in line).  Out of the employees who chose to stay at the facility for their meals, some state reasons unrelated to the security lines.  ECF 45, Ex. 249, Declaration of Yoshio Lopez ¶ 10 (stating that she chooses to stay on premises for meal breaks because she is often not hungry); ECF 45, Ex. 260, Declaration of Juan Castellanos ¶ 3 (choosing to take his meal break in the facility breakroom because he does not own a car and wants to bring healthier food from home).

### C. Rest Breaks

FedEx's policy defines a rest break as periods of time "when an employee is relieved of all duties during a shift." ECF 34, Ex. 7, at 12.  In states where rest breaks are required, the policy states that rest breaks must be 10 minutes in length, but any breaks longer than 20 minutes are unpaid. *Id.*  Employees "are not to clock out for their rest breaks." *Id.*

6

Depina and FedEx provide conflicting evidence on whether the security lines lead to interrupted or missed rest breaks. Eighteen of Depina's twenty-three declarants stated that they did not leave the facility during the rest breaks because of the long security checks. ECF 34, Ex. 19-41. Of the five who left, the declarants stated that they only had a few minutes of their rest break due to the security check station. Cranston Decl. ¶ 22; ECF 34, Ex. 38, Declaration of Miguel Plata ("Plata Decl.") ¶ 20; ECF 34, Ex. 29, Declaration of Amarrion Branner-Johnson ¶ 23; ECF 34, Ex. 32, Declaration of Alexandrea Talakihaamoa ¶ 22.

FedEx's declarants allege that the security does not impede their ability to leave the premises during their breaks. *See* ECF 45, Ex. 87, Declaration of Michael Caro ¶ 12 ("I take my 10-minute paid rest breaks outside in fresh air… The need to pass through security does not deter or prevent me from doing so."); ECF 45, Ex. 86, Declaration of Greg Barnett ¶ 11 ("I also take my paid rest breaks out in my car, and traveling through security to do so is just as quick as it is at any other time of the day and does not prevent me from getting a full rest break in my car.").

Those who take their rest breaks at the facility state that they do so due to personal preference. *See* ECF 45, Ex. 48, Declaration of Valery Delgado ¶ 11b ("Most of the time, I prefer to stay in the building during my 10 minute rest breaks."); ECF 45, Ex. 58, Declaration of Ruben Lopez ¶ 12b (same); Barajas Decl. ¶ 12b (same); ECF 45, Ex. 51, Declaration of Aaron Saddler ("Saddler Decl.") ¶ 11b ("I know I am allowed to leave the building during my rest breaks. However, I chose not to do that, because I prefer to buy and eat a snack during that time.").

### D. Recordkeeping

Depina also states that FedEx's timekeeping records reflect a late, shortened or missed meal period and reflect that a meal break premium was not paid. Mot. 24-25. While neither FedEx nor Depina submitted timesheets to the Court, the testimony of her expert, James Toney, found that 34% of the meals were short, late, or missed. ECF 34, Declaration of James Toney ("Toney Decl.") at 6. FedEx, however, has had a practice of paying a premium equal to one hour of regular pay if the package handler does not have the opportunity to take a meal break, since February 1, 2022. ECF 44, Ex. 2, Declaration of Karen Wharton ("Wharton Decl.") ¶ 10. Since that date, local managers then review that reports that "autogenerate" when a package handler

1  records what may be a noncompliant meal.  *Id.* ¶ 11.

2  FedEx provides a letter stating that FedEx had a conversation with Depina when she was

3  disciplined for not taking her full 30-minute meal break.  ECF 45, Ex. 15.  It stated:

> Clara failed to take a full 30-minute meal break on 03/28/2022.  She's short 3 mins for her full 30 mins. Required lunch break.  She clock[ed] out [sic] 6:05 am and clock in back @ 6:32 am.

*Id.*

It then stated:

> This is a full violation of Acceptable Conduct Policy-010 and MyTime Clock Guidelines RHMR-191 CA Touch.  Further violations may lead to disciplinary action up to and including termination.

*Id.*

## III.  LEGAL STANDARD

"Rule 23 provides a procedural mechanism for 'a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.'"  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010)).  Plaintiffs must make two showings pursuant to Rule 23.  *Id.*  "First, the plaintiffs must establish 'there are questions of law or fact common to the class,' as well as demonstrate numerosity, typicality and adequacy of representation."  *Id.* (citing Fed. R. Civ. P. 23(a)).  "A common question 'must be of such nature that it is capable of class wide resolution- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Id.* at 663 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L.Ed.2d 374 (2011)).  "In contrast, an individual question is one where 'members of a proposed class will need to present evidence that varies from member to member.'"  *Id.* (*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016)).  After plaintiffs have demonstrated that the class fits into the requirements of Rule 23(a), the plaintiffs must next show that the class fits into at least one of the three categories of Rule 23(b)(b).  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(b)).

The district court has the discretion to determine whether a class should be certified.

*Dominguez v. Schwarzenegger*, 270 F.R.D. 477, 484 (N.D. Cal. 2010). Before certifying a class, the "district court must be satisfied, after a rigorous analysis, that the prerequisites" of both Rule 23(a) and 23(b)(3) have been fulfilled. *Olean*, 31 F.4th at 664. This rigorous analysis includes how the policies were enforced, implemented, and followed. *Miles v. Kirkland's Stores*, 89 F. 4th 1217, 1222 (9th Cir. 2024). It may involve the merits of the claims. *Ellis*, 657 F.3d at 980. "[A] district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Id*. at 981 (emphasis in the original).

It is the plaintiffs, however, that bear the burden of demonstrating that each element of Rule 23 is satisfied, and "a district court may certify a class only if it determines that the plaintiffs have borne their burden." *Dominguez*, 270 F.R.D. at 484 (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 158-61 (1982)). Plaintiffs cannot "plead or speculate" their way to class certification. *Miles*, 89 F.4th at 1222. The plaintiffs must instead "marshal facts showing, by a preponderance of the evidence, that class issues predominate." *Id*. (citing *Olean*, 31 F.4th at 664-65).

## IV.   DISCUSSION

Depina moves to certify two classes pursuant to Rule 23(a) and Rule 23(b)(3): the Security Check Class and the Recordkeeping Meal Period Class. She also seeks to certify two subclasses: the Security Check Meal Period Sub-Class, the Security Check Rest Break Sub-Class. ECF 34.

### A.   Rule 23(a) Requirements

Rule 23(a) provides that a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

#### i.   Numerosity

Rule 23(a)(1) is satisfied when "the class is so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In order to satisfy this requirement, plaintiffs need not state the exact number of potential class members, nor is there a specific number that is required." *In re Facebook, Inc. PPC Advert. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012). Court, however,

1    have generally found that the numerosity requirement is satisfied if the class comprised 40 or more
2    members. *Id*. Here, the proposed class includes around 69,000. FedEx does not challenge that
3    this class meets the numerosity requirement. Because a class of over 60,000 members is well over
4    the threshold number of 40 class members, and there is no compelling dispute regarding
5    numerosity, numerosity is satisfied.

        **ii.   Commonality**

Rule 23(a)(2) requires that plaintiffs show there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy commonality, plaintiff must "demonstrate that the class members have suffered the same injury," rather than demonstrating that there are common questions. *Wal-Mart*, 564 U.S. at 349-50 (internal citations omitted). The claims must not only suffer a violation of the same provision of law, but also depend on a common contention. *Id.* at 350. That common contention must be capable of class-wide resolution, meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Not every question of law or fact must be common to the class, but instead Rule 23(a)(2) requires that a "single *significant* question of law or fact" be common across class members. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (emphasis in original).

Plaintiff here conflates the Rule 23(a) analysis with the Rule 23(b)(3) analysis, choosing to analyze the Rule 23(a) commonality with the Rule 23(b)(3) predominance claim. The Court here analyzes just the Rule 23(a) claim here and then analyzes the Rule 23(b)(3) claim below. In evaluating the evidence provided, the Court acknowledges that many of FedEx's declarants are current employees and "may be tainted by bias," but nevertheless finds them credible and reviews all of the evidence submitted as a whole. *See Dunbar v. Albertson's, Inc*, 141 Cal. App. 4th 1422, 1429 (Cal. Ct. App. 2006) (holding that defendant's proffered declaration may be tainted by bias because they are from current employees, but ultimately held them to be credible).

        **a.  Security Check Class**

Here, Plaintiff alleges that the common issues of fact and law are 1) whether FedEx Ground employees are subject to unpaid security screenings; 2) whether employees should be

10

compensated for security screenings under California law; 3) whether all employees clock in an out using the same timekeeping system and are paid through the same payroll; 4) whether requiring employees to undergo security checks prior to leaving them facility during meal periods or rest breaks is in violation of California labor laws entitling the employee to a meal break premium and/or minimum wages; 5) whether employees who stay on premises for a rest break due to security checks are entitled to rest break premiums based on a violation of California law. Mot. at 21-22.

      The questions that Plaintiff propose do not demonstrate a common issue of fact or law. For instance, the answer to the first question is "maybe." Some FedEx employees from the period between February 4, 2022 to the present were subject to unpaid security screenings. Each FedEx facility, however, had the discretion to set up their security screenings separately, which led to different experiences across the facilities. Not all putative class members were underpaid. FedEx facilities pay a flat amount to their employees based on the number of times they clock in and out. While some class members may be underpaid in this instance, others who work at facilities with short security lines may be overpaid. Furthermore, FedEx began to change its policies at the beginning of the putative class period based on a settlement for a prior class action. As a result, FedEx began installing clocks at the security areas so that employees could clock in and out of the security lines. Those facilities began to pay employees for the exact time they spent waiting on the security line. ECF 47, Ex. 14. The putative class members at those facilities were paid for the exact amount of time they spent waiting on security lines.

      As for the next question, FedEx concedes that "[n]o one disputes that security wait time is compensable under California law," but argue that the answer to the question does not resolve liability. Opp'n at 7-8. That question also does not answer the question of whether FedEx has a uniform policy that results in unpaid security screenings. Because neither party disputes that security wait time is compensable under California law, and because the dispute is whether they are fully compensated for the actual time spent undergoing security, this question does not indicate whether there is common injury. *See Frekin v. Apple*, 8 Cal. 5th 1038 (2020) (holding that time spent waiting for exit searches was compensable for "hours worked" within the meaning of

11

1  California Industrial Welfare Commission Wage Order no. 77).

2      Similarly, the next question does not establish a common law or fact.  Establishing that the employees clock in and out using the same timekeeping system does not account for the fact that some employees waited for security on the clock while others waited off the clock, based on whether their facility had installed a security time clock.  At some facilities, employees testified that they chose not to use the security clocks or use them sporadically.  *See* ECF 45, Ex. 59, Declaration of Jamie Perez ¶ 6b ("I do not use the security time clocks… I would rather wait to swipe my badge to clock in at the facility because it does not take that long to get through security."); ECF 45, Ex. 78, Declaration of Benjamin Hererra Diaz ¶ 6b ("I know there is a timeclock by security, but I don't use it."); ECF 45, Ex. 71, Declaration of Eric Rodriguez ¶ 6b ("I always use the time clocks in the security area when I am leaving at the end of the day, but I don't think about using them on the way in.").

    For the fourth question, while most employees must undergo security screening to leave the facility to take their meal periods or rest breaks, there is no evidence that this is in violation of California law.  This question also does not apply to every putative class member because many of them stay on the premises during their meal and rest breaks.  Of the employees who do, not all state that a long security line cuts into their meal break.  Furthermore, those employees who work at facilities with security time clocks would be paid for the time spent on the security line during meal or rest periods.  The fourth question, therefore, is not common fact or law.

    Finally, the fifth question asks whether employees staying on premises for a rest break due to security checks is a violation of California labor laws entitling them to rest break premiums.  This question is also not common to the class because not all employees stayed on the premises for their rest breaks.  Those who did also had different reasons, such as simply choosing preferring to stay on the premises.  *See* Saddler Decl. ¶ 11b ("I know I am allowed to leave the building during my rest breaks.  However, I chose not to do that, because I prefer to buy and eat a snack during that time.").

    Accordingly, the Court finds that there is no commonality because there are no questions of law or fact common to each putative class member.

### b. Recordkeeping Class

Depina here alleges that the common issue of law is whether a meal period premium was paid to the putative class members when, based on FedEx's timekeeping records, class members took a late, short, or even missed their first or second meal break. Mot. at 24-25. In this case, however, FedEx has a policy of paying package handlers premiums when they miss a meal break. Wharton Decl. ¶ 10. FedEx allegedly paid $799,580.68 in premiums to package handlers between February 2022 and December 2023. ECF 44, Ex. 4, Declaration of Joseph A. Krock, at 3. The fact that Depina was contacted when she took a shortened meal break is further evidence that FedEx keeps track of missed or even late or shortened meal breaks. ECF 44, Ex. 15.

Although Depina concedes that FedEx's policies "facially comply" with California law, she argues that the problem is that package handlers must wait in security lines during their meal breaks, which shortens their meal breaks. Mot. at 10. As discussed above, because FedEx paid some workers for the actual time spent waiting for security while other workers were paid a flat rate and may have been underpaid, payment relating to the security screening lines is not a class-wide issue because class members had different experiences. Accordingly, whether FedEx's timekeeping records reflect missed or shortened meal periods, and whether FedEx paid a premium for those missed meal periods is not a class-wide issue. As such, the recordkeeping class also lacks commonality.

### iii. Typicality

Typicality is reached when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Where the challenged conduct is a policy or practice that affects all class members, the underlying issue presented with typicality is similar to that presented with respect to commonality, although the emphasis may be different." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). The test for typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. am., LLC*, 617 F.3d 1168, 1175 (9th Cir.

2010).

Just as there is no common question, there is also no typicality. Depina's injury is not typical of the class because there is no injury common to the entire class. For instance, while Depina alleges that she was underpaid for security, had shortened or interrupted meal breaks and rest breaks, the entire class does not share these injuries. Other members of the class were appropriately paid for security wait times because their facilities either had security time clocks or short lines. Some package handlers were allegedly even overpaid because they were paid a flat rate for security and did not have to wait in a line. Because Depina's injury is not typical of the entire class, typicality is not met.

### iv.   Adequacy

Rule 23(a)(4) provides that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement consists of two inquiries: (1) do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003).

In this case, there are no conflicts of interest between Depina and other class members. Depina and the class members are all former or current package handlers and there are no issues of antagonism between them. *See Ellis*, 657 F.3d at 985 (explaining that adequate representation depends partially on an absence of antagonism between representatives and absentees). Furthermore, they all seek the same remedy: monetary damages.

As to the second question, FedEx argues that Depina cannot manage the putative classes' claims because she misrepresented FedEx's policies, such as the fact that FedEx paid for security, and misrepresented her own experience such as omitting one of her two job sites. Opp'n at 31. While Depina may have framed the facts in a different way than FedEx, her framing does not mean that she is unable to understand the facts of the case. Depina's framing of the facts in a way that is different from FedEx is not evidence that she cannot vigorously prosecute the class. FedEx also cites Depina's deposition testimony when she responds to FedEx's questions of whether she

knows that she is bringing a class action or trying to serve as a class representative with "I don't know." *Id.* FedEx, however, otherwise did not make an argument that Depina did not know she was a named plaintiff. In fact, in her declaration, she states that she understands that the case is a class action and that she is the class representative. Depina Decl. ¶ 9. Because Depina's answers in her deposition appear to be standard deflections rather than honest answers demonstrating that she is unfamiliar with the case, this does not prove that she is unable to vigorously prosecute the case.

The putative class counsel has regularly engaged in class action litigation, including oner 100 wage-and-hour class actions, and has practiced employment and labor law for over a decade. ECF 34, Declaration of Shaun Setareh ("Setareh Decl.") ¶ 4, 6. He is therefore experienced. *See In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 584 (N.D. Cal. 2015) (finding that class counsel who has regularly engaged in "major complex litigation" and has been appointed class counsel in similar cases can adequately represent the class).

Accordingly, the Court finds that Depina and class counsel satisfy the adequacy requirement.

### B. Rule 23(b)(3) Requirements

Rule 23(b)(3) requires that before a class is certified, "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L.Ed. 2d 689 (1997). This inquiry differs from a Rule 23(a) commonality inquiry because it requires a weighing of "the common questions in the case against the individualized questions." *In re Facebook*, 282 F.R.D. at 455.

In analyzing whether a company had a uniform policy, the court looks to both "a company's policy by itself" and "whether the company consistently implemented and enforced the policy across all employees during the class period." *Miles*, 89 F.4th at 1223. "[A]n employer's official policies are relevant to the Rule 23(b)(3) analysis, but a district court abuses its discretion

15

1    by relying on such policies to the near exclusion of other relevant factors touching on
2    predominance." *Id.* at 1222.  The "mere existence" of a company policy does not "constitute
3    significant proof that a class of employees was subject to an unlawful practice" if there is "little
4    evidence that it was implemented or enforced uniformly." *Id.* at 1224 (internal quotations
5    omitted).  However, a "smattering of examples involving a few isolated cases does not
6    automatically defeat class certification" when the evidence otherwise "shows that the company
7    consistently enforced its policy across all employees." *Id.* at 1223-24.  The Ninth Circuit has
8    denied class certification in cases that raise "complicated questions of who was ever exposed" to
9    the policies and "whether those who were exposed were harmed in a way giving rise to liability."
10   *Castillo v. Bank of Am.*, 980 F.3d 723, 733 (9th Cir. 2020).

11   Here, there is no predominance because there is no uniform policy that FedEx was
12   underpaying its package handlers for the time they waited on the security screening, no evidence
13   that these security screenings uniformly led to shortened meal or rest breaks, and no evidence that
14   the timekeeping records reflected this.  What complicates this case is that FedEx began instituting
15   changes to the security pay as a result of a previous class action settlement on the same issues,
16   which ended the day before this case class periods begin.  As a result, there are changes to
17   FedEx's policies throughout the class period that are being implemented at different stores at
18   different times, making it more difficult for Plaintiff to demonstrate a uniform policy across all
19   stores.  *See* ECF 47, Ex. 14 (listing the dates the security time clocks were installed at the 36 out
20   of 58 facilities between 2022 and 2023).  As of January 21, 2024, FedEx now requires employees
21   to punch into security area time clocks "both upon arrival and departure" and began paying "non-
22   exempt employees (including package handlers) for actual security waiting and screening time,
23   instead of estimate timed." ECF 34, Ex. 7.

24         **i.    Security Check Class**

25   FedEx had a companywide policy that required security screenings.  Interestingly, the
26   policy allowed each facility to determine how it organized its security screenings and failed to
27   indicate whether the screening was on or off the clock.  Some facilities had airport-style metal
28   detectors, while others had turnstiles.  *See* Cranston Decl. ¶ 10 (explaining that there are airport-

16

1   style metal detectors); Depina Depo. 230:8-14 (explaining that the manager just let her through the
2   turnstile and that there was no other security process at the Santa Rosa facility).  Some facilities
3   allegedly had no security or very little security.  *See* Fistolera Decl. ¶ 6 (explaining that "[t]here
4   currently is no security, no one checking bags, no metal detectors or anything like that" although
5   there was the year before); Montes Decl. ¶ 6a (explaining that some days there is "no security
6   guard there, so I just walk through" but that even on days the security guard is there but the "metal
7   detector is frequently turned off").

8         While the facilities without security may be an exception to the general rule requiring
9   security screenings, the fact that a few facilities had little to no security illustrates the level of
10  discretion that FedEx gave to facilities regarding the security process.  *See* Krock Decl. at 9
11  (finding that 97% of survey respondents indicated that they were required to pass through a
12  security checkpoint entering or exiting a facility).  This is further complicated by the fact that
13  some facilities had shorter security lines than others.  *See* ECF 45, Ex. 52, Declaration of
14  Theodore Barry ¶ 4 ("There's only one entrance to the facility and there is almost always no line
15  when I get to the security gate."); Plata Decl. ¶ 9 ("As a package handler, there would typically be
16  a line of approximately 10 people given that we all started at the same time each day.  It would
17  typically take 2 to 3 minutes to get to the front of the line."); Foreman Decl. ¶ 11 ("As a package
18  handler, there would typically be a line of approximately 15 to 30 people given that we all start at
19  the same time each day.  It would typically take approximately 20 to 30 minutes to get to the front
20  of the line.").

21        This can case be distinguished from other cases involving "bag checks" because those
22  cases involved policies in which the companies required off-the-clock inspections.  For instance,
23  Depina cites *Rodriguez v. Nike*, in which Nike had a uniform policy that required its employees to
24  clock out because they were checked.  No. 5:14-cv-01508-BLF, 2016 WL 8729923, at *5 (N.D.
25  Cal. Aug. 19, 2016). Depina also cites *Chavez v. Converse* in which "Converse stores are set up
26  such that an employee would necessarily be off-the-clock when a bag check occurs."  No. 15-cv-
27  03746-NC, Dkt. No. 89, at 3 (N.D. Cal. Sept. 22, 2016).  In this case, some employees undergo
28  security on the clock while others undergo security off the clock.  For example, some package

17

1    handlers at the 36 locations with security time clocks undergo security on the clock; whereas some
2    at those locations testify that they choose to undergo security off the clock. Similarly, employees
3    at the other locations undergo security off the clock. Accordingly, unlike similar cases, there is no
4    uniform policy requiring or making it so that package handlers off the clock.

5    Next, there is also no uniform policy underpaying package handlers for the time they spend
6    on security screenings. In this case, some package handlers may be underpaid for the time they
7    spend on the security screening lines. However, this is not true across all the facilities during the
8    entire putative class period. As of January 21, 2024, FedEx began paying employees for the exact
9    time they spent on the security lines. However, as early as July 3, 2022, FedEx began
10   implementing security time clocks at facilities. ECF 47, Ex. 14; *see also* Krock Decl. at 4 (stating
11   that FedEx's expert reviewed punch records from timeclocks at security checkpoints starting on
12   July 3, 2022).

13   The evidence in the record illustrates that some package handlers were underpaid, some
14   were overpaid, and some were paid for the exact time they spend in the security line. FedEx
15   began paying some employees at facilities with time clocks for the exact time they waited on the
16   security lines beginning in July 2022. Employees at the locations with security time clocks were
17   not underpaid because they were paid for the amount of time it took to go through security. This
18   included employees at 36 different facilities between 2022 and 2023. At the other facilities,
19   FedEx paid employees a flat rate for security wait times ranging between 1 and 3 minutes at the
20   discretion of the facility. Grabowski Decl. ¶ 14. Employees were paid the flat rate based on the
21   number of time punches recorded. *Id.* FedEx's expert found that FedEx paid package handlers an
22   average of 5.65 minutes per shift based on the flat amount and 4.21 minutes per shift based on the
23   security punches, while Depina's expert found that the average security wait time was an average
24   of 6.2 minutes. Krock Decl. at 3; Toney Decl. ¶ 7. While Depina's expert's evidence suggests
25   that some employees were underpaid, it does not account for the fact that employees who worked
26   in facilities either without security lines or with security time clocks were either paid properly or
27   overpaid.
28   Because there is no uniform policy, the Court would need to look at everyone's individual

circumstances to determine who has an injury and what are their damages. Courts have certified classes that subtracted the individual members without injuries, such as in *Tyson* when the Court removed all individuals who did not work overtime. *See Tyson*, 577 U.S. at 451. However, in this case, there are many more variables the Court would have to consider, such as which facility class members worked, whether the facility paid employees for the security wait time using the flat amount or the security time clocks, and how long were the security lines. Furthermore, while there are some courts that have also determined that individual damages do not undermine predominance claims, this is irrelevant in this case because there is no uniform policy.

### ii.    Meal Class and Rest Break Subclasses

There is also no common policy as to the meal break or rest break classes. Depina alleges that some of the package handlers chose to stay on the premises because of the long security lines, while others chose to leave, resulting in shortened meal or rest breaks due to long security lines. For instance, package handlers who work at facilities with little to no security cannot allege that their breaks are cut short due to long security lines. Furthermore, employees have the option to stay on the premises during their meal and rest breaks, and many of them do. Because the facilities do not have a consistent policy regarding security, and because there is evidence that some facilities have short security lines, there cannot be a consistent policy that meal or rest breaks are cut short due to long security lines.

### iii.    Recordkeeping Class

Time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations at the class certification stage. *Donohue v. AMN Sers., LLC*, 11 Cal. 5th 58, 65 (2021). In this case, however, the time records do not show noncompliant meals breaks, so Depina has not triggered the *Donohue* presumption. FedEx has policies to ensure that the package handlers took their compliant meal breaks, and even contacted the employees with a warning who did take compliant meal periods. ECF 45, Ex. 15. Long security lines did not affect all package handlers in the putative class, so not all of the timekeeping records were affected by the security lines. *See, e.g.*, Toney Decl. 6 (finding that 34% of meal periods were noncompliant). To determine whose timekeeping records reflected a noncompliant meal period, the Court would have

1  to look at each package handler's timekeeping records and look at factors such as whether their
2  facility had long security lines and whether the facility used security time clocks. Accordingly,
3  Depina cannot show predominance.
4  Finally, because Depina has not established predominance, Depina also cannot establish
5  that a class action is superior to other methods of adjudication in this case.

## V. CONCLUSION

Although Depina has established numerosity and adequacy, the Court finds that she has failed to establish commonality and typicality as required by Rule 23(a) as to any of the classes or subclasses. Depina cannot establish commonality because there is no common question of law or fact to the class given the variance in the length of the security lines and the security wait time payment methods. She cannot establish typicality because the putative class members do not share the same injury. Finally, Depina cannot establish predominance pursuant to Rule 23(b) because the lack of a uniform policy would require the Court to make individual inquiries.

Depina and her colleagues at the Fairfield facility, for instance, may have experienced long security wait times and shortened meal and rest periods, but this is not true across all California facilities. Package handlers at facilities with shorter security lines or less security measures do not have same injuries or damages.

For the foregoing reasons, Plaintiff's Motion to Certify Class is **DENIED**.

This order terminates ECF 34.

**IT IS SO ORDERED**.

Dated: November 6, 2024

TRINA L. THOMPSON
United States District Judge